1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16

| UNITED STATES OF AMERICA, | Case No.:  21-mj-03297-WVG-GPC-1 |
|---|---|
| Plaintiff, | **ORDER AFFIRMING MAGISTRATE JUDGE DECISION** |
| v. | |
| FREDDY DANIEL MUNOZ-PEREZ, | **[ECF No. 56]** |
| Defendant. | |

17

## INTRODUCTION

18      Freddy Daniel Munoz-Perez was convicted of attempted improper entry under

19  8 U.S.C. § 1325(a)(1) in a bench trial before a magistrate judge.  ECF No. 49.  He timely

20  appealed the conviction to this Court, ECF No. 56; Fed. R. Crim. P. 58 (g)(2)(B), which

21  has jurisdiction to review the magistrate's decision pursuant to 18 U.S.C. § 3402.

22  Munoz-Perez filed an Opening Brief, the Government responded with an Answering

23  Brief (titled "Reply Brief"), and Munoz-Perez filed a Reply Brief.  ECF Nos. 67-68, 70.

24      The Court AFFIRMS Munoz-Perez's conviction.

25  ## BACKGROUND

26      A U.S. Border Patrol Agent, James Alston, arrested Munoz-Perez around 9 p.m. on

27  August 12, 2021, Munoz-Perez's nineteenth birthday.  ECF No. 67-1 at 72, 77, 216 (born

28

on August 12, 2002).[1]  The area in which the arrest occurred was mountainous and wooded, about six to eight miles from the U.S.-Mexico border.  *Id.* at 79, 84.  The only business nearby was a campground about a mile away.  *Id.* at 79.  The Agent found Munoz-Perez "hid . . . real deep in some brush, if you will."  *Id.* at 81.  When Munoz-Perez came out of the brush and put his hands up, following Agent Alston's orders, he was wearing handcuffs on one wrist, with one cuff around his wrist and the other hanging.  *Id.*  He had no shoes, tattered socks, and no other belongings.  *Id.* at 84-85.

The night before, about three miles north of the international border in an area commonly used by people entering illegally, Agent Mauricio Ramos arrested a "Hispanic male" laying on the ground in the brush.  *Id.* at 31-34, 89.  He believed the man had been with a small group.  *Id.* at 34.  He handcuffed him on both wrists and then instructed him to follow as he went to find the others in the group.  *Id.* at 34-35.  Before Agent Ramos obtained any further information from him or even had a good look at his face, the man ran away into the brush.  *Id.* at 46, 39.  The next morning, Agent Joshua Bailey saw, from a distance, a man running with something gray swinging in or from his right hand.  *Id.* at 55, 57-58.  He believed the man was going north based on his footprints.  *Id.* at 63-64.  Because of the handcuffs on his wrist, Agent Alston assumed that Munoz-Perez was the same man whom Agent Ramos had arrested and whom Agent Bailey had seen.  *Id.* at 82.

After coming out of the brush, Agent Alston immediately handcuffed Munoz-Perez and walked him to the nearest fire road, where the Border Patrol trucks were parked.  *Id.* at 82.  The walk to the trucks was about "five minutes, if that."  *Id.* at 84.  In the open by the trucks, Agent Alston asked Munoz-Perez in Spanish what his citizenship was, whether he had documentation to be in the U.S., and whether he was in the U.S. illegally.  *Id.* at 83.  Munoz-Perez responded that he was a Mexican citizen, that he did not have

---

[1] Page numbers reflect CM/ECF pagination.

documentation to be in the U.S., and that he was there illegally.  *Id.*  Agent Alston did not provide *Miranda* warnings at any time.  *Id.*

Border Patrol agents then brought Munoz-Perez to a Border Patrol station where he was questioned soon after midnight by Agent Roberto Tobar.  *Id.* at 109, 208.  For convenience, the Court will refer to this interview as "the station interrogation."  The station interrogation was conducted in Spanish and video recorded.  *Id.* at 208; ECF No. 69 (DVD).  Agent Tobar read Munoz-Perez his *Miranda* rights, and after Munoz-Perez expressed confusion—including answering both "Alright" and "Well, truthfully, this, no" to the question of whether he was willing to speak with Agent Tobar without an attorney—Agent Tobar read them a second time.  ECF No. 67-1 at 209-12.  Munoz-Perez eventually stated that he understood the rights and was willing to speak.  *Id.* at 212.  He also signed a *Miranda* form.  *Id.* at 213.

During the station interrogation, Munoz-Perez admitted that he was from Chiapas in Mexico, that his parents were Mexican, that he did not have documents allowing him to be in the U.S., and that he had crossed into the country through the mountains because he wanted to work and needed surgery.  *Id.* at 216-20, 222-23, 230.  Agent Tobar attempted to ask him about the arrest by Agent Ramos, but the two had difficulty communicating and it was unclear if they were speaking about the same incident.  *Id.* at 226-39.  Munoz-Perez had some difficulty understanding Agent Tobar's questions throughout the interview.

The same day, on August 13, 2021, Munoz-Perez was charged with violating 8 U.S.C. § 1325(a)(1) for improper entry.  ECF No. 1 at 1.  On September 24, 2021, he proceeded to a motion hearing and bench trial in front of a magistrate judge.  ECF No. 49.  Prior to the trial, Munoz-Perez had filed a series of motions, including a motion to exclude the station interrogation for lack of a valid *Miranda* waiver.  ECF No. 11 at 8-9.  After hearing testimony, the magistrate judge denied the motion and held that the station interrogation was admissible.  *Id.* at 182.  During the trial, the Government presented testimony from Agents Ramos, Bailey, Alston, and Tobar, *see generally* ECF No. 67-1,

as well as that of an A-file custodian who testified that there were no records indicating that Munoz-Perez had permission to enter the U.S., *id.* at 165-67. Munoz-Perez presented only one witness, an investigator who explained that standard handcuffs are easily purchased by civilians and often lost by law enforcement. *Id.* at 187-88.

During Agent Tobar's testimony, the Government introduced into evidence the video of the station interrogation and a transcript with the original Spanish and translated English side-by-side. *Id.* at 113-114. The translated transcript was produced by an interpreter from the U.S. Attorney's Office who had been certified by the Administrative Office of the United States Courts ("AO"). *Id.* at 206-07. She did not testify. *See generally id.* Instead, Agent Tobar testified that he had watched the video and compared it to the translated transcript and that the translation was accurate. *Id.* at 114. The magistrate judge allowed both the video and transcript into evidence. ECF No. 51.

The Government attempted to play the video, but the audio quality was so bad that the magistrate judge eventually suggested reading the transcript instead. ECF No. 67-1 at 138, 115-25. The magistrate judge gave the Government an opportunity to play the video with or without sound, in addition to reading the transcript, but the Government declined to do so. *Id.* at 138. Defense counsel objected to the reading of the transcript without the video as contrary to Munoz-Perez's Fifth and Sixth Amendment rights, highlighting that the transcriber and translator was not available for cross-exam, and as inadmissible hearsay. *Id.* at 126. The magistrate judge overruled the objections, explaining that Agent Tobar authenticated the transcript and that the defense could have provided a competing translation because they had the video and transcript in advance. *Id.* at 128-31. The magistrate judge allowed defense counsel to voir dire Agent Tobar regarding the transcript's accuracy. *Id.* at 131.

In the end, the magistrate judge found Munoz-Perez guilty, *id.* at 195, and Munoz-Perez timely appealed. ECF No. 56.

**DISCUSSION**

Munoz-Perez raises six challenges to his trial and conviction: (1) his statements to Agent Alston in the field should have been suppressed because Agent Alston should have Mirandized him; (2) his statements in the station interrogation should have been suppressed because he invoked his right to silence and was then questioned in violation of *Miranda*; (3) in the alternative, his statements in the station interrogation should have been suppressed because he did not knowingly and intelligently waive his *Miranda* rights; (4) the translated transcript of the station interrogation was inadmissible hearsay and violated his Confrontation Clause rights; (5) the Government failed to sufficiently corroborate his admissions under the corpus delicti doctrine; and (6) § 1325 violates the Fifth Amendment's equal protection guarantee.  ECF No. 67 at 2.

## I.   The Admissibility of the Field Interview under *Miranda*

Munoz-Perez first argues that his statements in the field to Agent Alston should have been suppressed because he did not receive *Miranda* warnings even though he was "in custody," in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  ECF No. 67 at 14.  The Court reviews the admission of an un-Mirandized statement de novo.  *United States v. Cabrera*, 83 F.4th at 729, 734 (9th Cir. 2023).

*Miranda* requires warnings only when an individual is "in custody" during questioning.  *United States v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013).  Ordinarily, an individual is in custody for *Miranda* purposes when "a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave."  *United States v. Medina-Villa*, 567 F.3d 507, 519 (9th Cir. 2009) (citation omitted).  But as the Ninth Circuit recently explained, "the case books are full of scenarios in which a person is detained . . . [and] is not free to go, but is not 'in custody' for *Miranda* purposes."  *Cabrera*, 83 F.4th at 734 (citation omitted).  As a result, the Ninth Circuit "has consistently addressed *Miranda* challenges at the border by asking whether the detention constituted a permissible *Terry* stop, or something more."  *Id.* at 734; *see also United States v. Ramos*, No. 21-10184, 2023 WL 2853516, at *1 (9th Cir.

Apr. 10, 2023) ("A person detained during a *Terry* stop is generally not 'in custody' for *Miranda* purposes."). If the officer limits the questioning to investigating the suspicion that prompted the stop, i.e. does not exceed the scope of a *Terry* stop, a *Miranda* warning is not required. *See United States v. Cervantes-Flores*, 421 F.3d 825, 830 (9th Cir. 2005), *overruled on other grounds by Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). Thus, instead of asking whether a reasonable person in the situation would feel free to leave, as Munoz-Perez does, ECF No. 67 at 15-17, the Court considers whether the scope of the interaction exceeded the bounds of a *Terry* stop and therefore became custodial interrogation requiring a *Miranda* warning. *See Cabrera*, 83 F.4th at 735.

The Ninth Circuit has held multiple times that brief questioning about citizenship and authorization to be in the U.S. does not require *Miranda* warnings. *Id.* at 735 (holding that defendant's un-Mirandized statements in response to a question about his purpose in the U.S. from a Border Patrol agent who did not handcuff, threaten, or yell at him during the course of a ten minute stop were properly admitted); *Medina-Villa*, 567 F.3d at 520 (holding that the occupant of a car who was stopped by a Border Patrol agent who "prevented [the occupant/defendant] from leaving the parking lot by blocking his car, approaching [the car] with his gun drawn, and interrogating him about his citizenship and immigration status" was not in custody for *Miranda* because the stop did not "venture beyond the restraints of . . . *Terry*"); *Cervantes-Flores*, 421 F.3d at 830 (holding that un-Mirandized statements were admissible where the Border Patrol agent chased down, handcuffed, and then asked the defendant about his citizenship and authorization to be in the U.S.); *United States v. Galindo-Gallegos*, 244 F.3d 728, 732 (9th Cir. 2001) ("Where officers apprehend a substantial number of suspects [of improper entry] and question them in the open prior to arrest, this is ordinarily a Terry stop, not custodial questioning."); *United States v. Gutierrez-Salinas*, 640 F. App'x 690, 694 (9th Cir. 2016) ("[T]he Ninth Circuit has repeatedly held that brief questioning near the border is a non-custodial Terry stop that does not trigger Miranda."). There are no facts here to indicate

that Agent Alston's stop of Munoz-Perez was any more intrusive than the stops in these cases.

Agent Alston found Munoz-Perez hiding in the brush and ordered him to sit up and show his hands.  ECF No. 67-1 at 81.  When Munoz-Perez complied, Agent Alston handcuffed him and walked him to where the Border Patrol trucks were, "about five minutes [away], if that."  *Id.* at 82-84.  He then asked three questions: (1) "Do you have any documents . . . to be . . . in this country legally?"; (2) "What country are you a citizen of"; (3) "Are you here illegally?"  *Id.* at 83.  Munoz-Perez answered that he had no immigration documents to be in the U.S., his citizenship was Mexican, and he was in the country illegally.  *Id.*

The stop was brief, the questions were relevant to determining whether Munoz-Perez entered improperly, and the restraint—handcuffs and walking five minutes to the cars—"was reasonable under the circumstances."  *Cabrera*, 83 F.4th at 735 (citation omitted).  To start, the Supreme Court held over a half a century ago that if an officer has reasonable suspicion that an individual is in the U.S. without authorization, the officer may question the individual "about their citizenship and immigration status" without it becoming a custodial arrest.  *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975).  Thus, the questions themselves—about Munoz-Perez's citizenship and whether he had authorization to be in the U.S. and was here illegally, ECF No. 67-1 at 75—were permissible because they "were reasonably limited in scope to determining whether [defendant] had crossed the border illegally."  *Cervantes-Flores*, 421 F.3d at 830.

Nor does the fact that Agent Alston handcuffed and walked Munoz-Perez about five minutes mean that the interaction became more than a *Terry* stop.  In *Cervantes-Flores*, the Ninth Circuit held that handcuffing the defendant did not make the stop a custodial arrest because the defendant "led the Agent . . . on a chase," which "increased the risk to [the Agent] and demonstrated an intention to evade arrest," justifying the use of handcuffs.  421 F.3d at 831; *see also United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009) ("[W]e allow intrusive and aggressive police conduct without

deeming it an arrest . . . when it is a reasonable response to legitimate safety concerns on the part of the investigating officers."). Here, Border Patrol was on the lookout for a man who had escaped in handcuffs the night before and when Agent Alston encountered Munoz-Perez with the handcuffs on one hand, he "immediately knew, or assumed, this was the individual who had escaped twice the night before." ECF No. 67-1 at 81-82. Reasonably suspecting that Munoz-Perez had previously been detained and then absconded, Agent Alston's use of handcuffs was reasonable under the circumstances because Munoz-Perez had "demonstrated an intention to evade arrest." *Cervantes-Flores*, 421 F.3d at 830.

And even with the five-minute walk, the stop was brief; in *Cabrera*, the Ninth Circuit found that a stop lasting "approximately ten minutes" did not require *Miranda* warnings. 83 F.4th at 735. Moreover, the Ninth Circuit has found more restrictive behavior can still constitute a *Terry* stop at the border. *See Medina-Villa*, 567 F.3d at 520 (holding that Border Patrol physically blocking defendant's exit and approaching with a drawn firearm did not exceed the scope of a *Terry* stop).

In sum, the "restraint to which [Munoz-Perez] was subjected was limited and reasonable," *Cabrera*, 83 F.4th at 735, such that the interaction did not exceed the scope of a *Terry* stop and a *Miranda* warning was not required.[2]  Testimony regarding the field interview was therefore admissible.

---

[2] Munoz-Perez points to two magistrate report and recommendations in which the magistrate judges suppressed an un-Mirandized field statement by a defendant in an improper entry case. ECF No. 67 at 16-17. Both pre-date *Cabrera*, 83 F.4th at 734, and one does not frame the analysis as a question about the scope of *Terry* stop. *See United States v. Barron-Garcia*, No. CR 09-02814, 2010 WL 4269573, at *4 (D. Ariz. Sept. 23, 2010), *report and recommendation adopted*, No. CR 09-2814, 2010 WL 4269572 (D. Ariz. Oct. 26, 2010). The other involved a stop that lasted one to two hours. *United States v. Pineda*, No. CR 09-2542, 2010 WL 3034514, at *3 (D. Ariz. July 19, 2010), *report and recommendation adopted*, No. CR 09-2542, 2010 WL 3038723 (D. Ariz. Aug. 3, 2010). They do not alter the Court's analysis.

**II.      Admissibility of the Station Interrogation under *Miranda***

Munoz-Perez next argues that his statements at the Border Patrol station should have been suppressed because they were elicited after he asserted his right to silence or, in the alternative, because his *Miranda* waiver was not knowing or intelligent.  ECF No. 67 at 17-21.  The Government contends that these arguments are waived and that they fail on the merits.  ECF No. 68 at 9-13.

The Court finds that there were no *Miranda* violations and that the station interrogation was admissible.

### a.   To the extent Munoz-Perez waived his *Miranda* challenges, the Court will address them anyway.

The Government first contends that Munoz-Perez's *Miranda* arguments regarding the station interrogation were waived because they were not raised in front of the magistrate judge.  ECF No. 68 at 9.  The Court does not find this persuasive.  Munoz-Perez argued before and during trial that the station interrogation violated his *Miranda* rights and in fact, the magistrate judge held that "I find that there was no violation of *Miranda* at the station[.]"  ECF No. 67-1 at 182.

There is no question that Munoz-Perez raised his invalid waiver argument with the magistrate judge.  In a pretrial motion, he wrote that his statements "taken during his Border Patrol station interrogation must be suppressed for lack of a valid *Miranda* waiver" and that his "alleged waiver was invalid as it lacked 'a full awareness of both the nature and right being abandoned' and the consequences of such waiver."  ECF No. 11 at 8 (citation omitted).

It is true that Munoz-Perez did not specifically articulate the argument that he invoked his right to silence in front of the magistrate judge, but courts in the Ninth Circuit may reach a waived issue when "the pertinent record has been fully developed." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010).  Here, the record regarding the station interrogation was very well-developed.  The interrogation transcript was read into the record, ECF No. 67-1 at 138, and the agent who conducted

9

the interview testified regarding his delivery of the *Miranda* warnings and Munoz-Perez's responses, including the alleged invocation. *Id.* at 142-48. The video of the interrogation is also in the record. ECF No. 69. This is therefore unlike the case cited by the Government, *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001), in which there were no facts in the record regarding the arguments that had not been previously raised. ECF No. 68 at 9. Accordingly, the Court will address both *Miranda* arguments.

### b. Munoz-Perez did not invoke his right to remain silent under *Miranda*.

Munoz-Perez contends that he invoked his right to silence after being informed of his *Miranda* rights and that the subsequent interrogation should have been excluded.[3] ECF No. 67 at 17-19. The Court reviews de novo whether Munoz-Perez invoked his *Miranda* rights. *United States v. Rodriguez*, 518 F.3d 1072, 1076 (9th Cir. 2008).

When an individual subject to custodial questioning invokes their right to silence, all questioning must cease. *Miranda*, 384 U.S. at 44-45. An invocation of the right to silence must be unambiguous and unequivocal, such as when the suspect states "that he wanted to remain silent or that he did not want to talk with the police." *Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010). Where the request is unequivocal, the officer may not attempt to clarify; "indeed, there is nothing to 'clarify.' Accordingly, if an officer seeks to clarify an unambiguous request and elicits an equivocal response, the suspect's post request statements 'may not be used to cast retrospective doubt on the clarity of the initial request itself." *Garcia v. Long*, 808 F.3d 771, 777 (9th Cir. 2015); *see also Smith v. Illinois*, 469 U.S. 91, 92 (1984).

---

[3] In his Opening Brief, Munoz-Perez titles the heading of the section "Mr. Munoz-Perez invoked his right to an attorney." ECF No. 67 at 17. However, the text of his motion clarifies that he is making an argument about his right to silence, not about his right to an attorney, *see id.* at 17-19, and his Reply Brief fixes the error in the section heading, ECF No. 70 at 2.

Here, Munoz-Perez contends that he unambiguously asserted his right to silence in the below exchange, which followed Agent Tobar's reading of his *Miranda* rights at the start of the interrogation:

> AGENT:  Okay. Are you willing to answer my questions without having an attorney present?
> MUNOZ: Alright.
> AGENT:  Yes? I need you to answer each question I ask you, I need you to answer yes or no.
> MUNOZ: Well, truthfully, this, no.
> AGENT:  What?
> MUNOZ: With this here, no.

ECF No. 67-1 at 210.  The Government argues that Munoz-Perez's responses—"Well, truthfully, this, no" and "With this here, no"—manifested confusion, not an assertion of the desire to be silent.  ECF No. 68 at 10.  It points out that he seemed to indicate with his head something on the table, ECF No. 69 (DVD at 2:35-40) and that the agent understood his statements to mean he was confused, ECF No. 67-1 at 144.  ECF No. 68 at 11-12.

The Court holds that Munoz-Perez did not invoke his right to silence.  In cases in which the Ninth Circuit has found an unambiguous assertion of the right to silence, the defendants made clear that they did not want to speak.  *See Jones v. Harrington*, 829 F.3d 1140 (9th Cir. 2016) ("I don't want to talk no more man"); *United States v. Bushyhead*, 270 F.3d 905, 912 (9th Cir. 2001) ("I have nothing to say"); *Garcia*, 808 F.3d at 773 (answering "no" to the question "do you wish to talk to me"); *Hurd v. Terhune*, 619 F.3d 1080, 1088-89 (9th Cir. 2010) ("I don't want to do that" in response to a request that he reenact the shooting).  The exchange between Agent Tobar and Munoz-Perez looks more like *United States v. Garcia-Morales*, 942 F.3d 474 (9th Cir. 2019) and *United States v. Rodriguez*, 518 F.3d 1072 (9th Cir. 2008).  In *Garcia-Morales*, after waiving his *Miranda* rights, the defendant was asked to identify his smuggling contacts and he replied that he was not "feeling cool with that camera," and then, when asked to give the officer a name, he said "I don't . . ." and trailed off while shaking his head "no." 942 F.3d at 476.  The Ninth Circuit found that Garcia did not invoke his right to silence

11

and that, at most, he did not want to speak about his co-conspirators on tape. *Id.* at 476-77.  In *Rodriguez*, the defendant was advised of his *Miranda* rights and asked if he wished to speak to the officer, to which Rodriguez replied "I'm good for tonight."  518 F.3d at 1075.  The Ninth Circuit found that "I'm good" was ambiguous and required the officer to clarify what Rodriguez meant. *Id.* at 1080.

Here, the ambiguity in Munoz-Perez's statements comes from both his contradictory answers and that he appears to refer to a physical object.  First, he initially answers Agent Tobar's question "are you willing to answer my questions without having an attorney present?" with "Alright."  ECF No. 67-1 at 210.  This indicates that he is willing to talk without a lawyer.  Then, when the agent attempts to clarify by asking him to answer with "yes or no," he makes the somewhat contrary statement "Well, truthfully, this, no" and appears to nod his head towards something on the table. *Id.*; ECF No. 69 (DVD at 2:35-40).  It is unclear what he is gesturing towards and whether he is responding to the earlier query about answering questions without an attorney or something else.  Evidently it was also unclear what this response meant to Agent Tobar, because he responded with "What?"  ECF No. 67-1 at 210.  Munoz-Perez's next response "With this here, no" and his repeated nod towards something between him and the Agent presents the same lack of clarity.  This combined with his initial answer of "Alright" makes it ambiguous whether he asserted his right to silence.  Accordingly, the Court holds that the station interrogation was not inadmissible on the ground that Munoz-Perez had invoked his right to silence.

### c. **Munoz-Perez knowingly and intelligently waived his *Miranda* rights.**

In the alternative, Munoz-Perez contends that the Government did not prove that his *Miranda* waiver was knowing, intelligent, and voluntary.[4]  ECF No. 67 at 19.  The

---

[4] Although Munoz-Perez and the Government refer to the voluntariness of Munoz-Perez's *Miranda* waiver, both parties limit their arguments to whether Munoz-Perez's waiver was knowing and intelligent.  Munoz-Perez does not contend that his waiver was

1  Court reviews whether the waiver was knowing and intelligent for clear error.  *United*
2  *States v. Price*, 980 F.3d 1211, 1226 (9th Cir. 2019) (en banc).

3  For statements made during custodial interrogation to be admissible, "the
4  defendant's waiver of *Miranda* rights must be voluntary, knowing, and intelligent."
5  *Price*, 980 F.3d at 1226.  A waiver is knowing and intelligent when "it is made with a
6  'full awareness of both the nature of the right being abandoned and the consequences of
7  the decision to abandon it.'"  *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998)
8  (en banc) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  To determine the
9  validity of the waiver, the Court considers "the totality of the circumstances including the
10 background, experience, and conduct of defendant."  *United States v. Shi*, 525 F.3d 709,
11 727 (9th Cir. 2008) (citation omitted).  The following factors are relevant:

12 (i) the defendant's mental capacity; (ii) whether the defendant signed a written
13 waiver; (iii) whether the defendant was advised in his native tongue or had a
   translator; (iv) whether the defendant appeared to understand his rights; (v)
14 whether the defendant's rights were individually and repeatedly explained to
15 him; and (vi) whether the defendant had prior experience with the criminal
   justice system.

16 *United States v. Crews*, 502 F.3d 1130, 1140 (9th Cir. 2007).  There is a presumption
17 against waiver, which the government must overcome by a preponderance of the
18 evidence.  *Id.* at 1139-40.

19 Here, Munoz-Perez was interviewed at the Border Patrol station the night of his
20 arrest by Agent Alston just a bit after midnight.  ECF No. 67-1 at 208.  He had no
21 criminal history or other experience with the criminal justice system and had turned
22 nineteen the day of the arrest.  *Id.* (interview on August 13, 2021); *id.* at 216 (born on

23

24 ───────────────────

25 caused by coercion or improper inducement, and there is no suggestion of coercion or
   improper inducement in the record.  *See United States v. Doe*, 155 F.3d 1070, 1074 (9th
26 Cir. 1998) (en banc) ("A waiver is voluntary if, under the totality of the circumstances,
27 the confession was the product of a free and deliberate choice rather than coercion or
   improper inducement."); ECF No. 67 at 19-21 (absence); ECF No. 70 at 12-13 (absence).
28 The Court therefore does not address whether Munoz-Perez's waiver was voluntary.

August 12, 2002); ECF No. 67 at 21; ECF No. 68 at 13.  There is no indication that he suffered from any mental impairments.  *See generally id.* (absence).  Agent Tobar read his *Miranda* rights and conducted the interrogation in Spanish, Munoz-Perez's native language.  *Id.* at 208.  Agent Tobar is also a native speaker.  *Id.* at 110.

After Agent Tobar read Munoz-Perez his *Miranda* rights, they had the following exchange:

> AGENT:  Do you understand each one of your rights as I have read them to you?
> MUNOZ: Well . . . yes.
> AGENT:  Yes?
> MUNOZ: Yes.
> AGENT:  Okay. Are you—are you willing to answer my questions without having an attorney present?
> MUNOZ:  Alright.
> AGENT:  Yes? I need you to answer each question I ask you, I need you to answer yes or no.
> MUNOZ: Well, truthfully, this, no.
> AGENT:  What?
> MUNOZ: With this here, no.
> AGENT:  Yes. What is it that you don't understand?
> MUNOZ: About an attorney and all that.
> AGENT:  Do you want me to explain them to you again?
> MUNOZ: No, that yes, but . . .
> AGENT:  The question is: Are yo—are you willing…? Do you understand each one of the rights as I have read them to you?
> MUNOZ: Mm, truthfully, I don't.
> AGENT:  You don't understand?
> MUNOZ: No.
> AGENT:  What is that you don't understand?
> MUNOZ: Well, like that [unintelligible] about an attorney.
> AGENT:  Okay. This says: You have the right to remain silent. Anything you say may be used against you in a court of law or in any admi . . . administrative or immigration proceedings.
> MUNOZ: Mm-hmm.
> AGENT:  You have the right to speak with an attorney so that he can advise you before we ask you any questions and to have him present with you during the questions.  If you don't have the money to hire an attorney, one may be provided to you before we ask you any questions if you wish.  If you decide to answer our questions now without an attorney present, you will always have the right to stop

answering whenever you like.  You also have the right to stop answering when you like until you can talk with an attorney.  So, do you understand each one of your rights as I have read them to you?
MUNOZ: Yes.
AGENT:  Yes?
MUNOZ: [nods]
AGENT:  I need you to tell me yes or no. I don't want you to do that.  Yes?
MUNOZ: Yes.

ECF No. 67-1 at 210-12.  The transcript demonstrates that after Munoz-Perez initially expressed confusion, Agent Tobar attempted to clarify what Munoz-Perez did not understand and re-read his *Miranda* rights.  Following the second reading, Munoz-Perez affirmatively and unequivocally agreed that he understood his rights.  Agent Tobar then helped Munoz-Perez initial and sign a written *Miranda* waiver, *id.* at 212-13, which is not in the record.  On cross-exam, Agent Tobar admitted that he "didn't tell [Munoz-Perez] specifically what it was [that he was signing]."  ECF No. 67-1 at 148.

Agent Tobar also read Munoz-Perez his consular rights, including informing him that "a consular officer . . . may help you obtain legal advice, get in touch with your family and visit you in jail."  *Id.* at 214.  Then when Agent Tobar asked "Do you wish to speak with the consulate?" Munoz-Perez responded "Well, I wanted to talk to my mom."  *Id.*  Defense counsel argues that this answer manifests Munoz-Perez's confusion.  ECF No. 67 at 20.  However, the answer appears to show that Munoz-Perez correctly understood that a consular official could assist him with contacting his family.

Defense counsel also argues Munoz-Perez had trouble understanding what a country was.  *Id.*  When Agent Tobar asked Munoz-Perez about where he was born and his citizenship, Munoz-Perez responded with his city of Ciudad Hidalgo and his state of Chiapas:

AGENT:  And where were you born?
MUNOZ: Ciudad Hidalgo, Chiapas.
AGENT:  In Chiapas, what?  In Chiapas.  What city in Chiapas?
MUNOZ: Ciudad Hidalgo.
AGENT:  Uh?
MUNOZ: Ciudad Hidalgo.

AGENT:  Ciudad Hidalgo, Chiapas.

MUNOZ: [nods]

AGENT:  Okay.  Chiapas, Mexico.

MUNOZ: Uh-huh. Yes.

AGENT:  And of what country are you a citizen?

MUNOZ: Mm, from the [unintelligible].

AGENT:  No.  Of what country?

MUNOZ: [unintelligible]

AGENT:  Yes.  Of what country?

MUNOZ: From Chiapas.  Ciudad Hidalgo.

AGENT:  No. Do you know what a country is?

MUNOZ: No.

AGENT:  You don't know what a country is?

MUNOZ: I don't know.

AGENT:  You don't know what a country is?  What is a city?  A state?

MUNOZ: State? Well, [unintelligible]

AGENT:  The state, Chiapas.

MUNOZ:  Uh-huh.

AGENT:  And the country?

MUNOZ: Mexico.

AGENT:  It's Mexico, the country, right?

MUNOZ: Uh-huh.

AGENT:  So, the country is Mexico.

MUNOZ: Yes.

AGENT:  Okay.  So, you know what a country is, right?

MUNOZ: Yes.

AGENT:  So, of what country are you a citizen?

MUNOZ: Well, that I don't know. [chuckles]

AGENT:  From . . .? You were born in . . .? are you—are you a citizen of Mexico?

MUNOZ: Yes.

AGENT:  Okay. So, you're a citizen—you're a citizen of Mexico.

MUNOZ: From Ciudad Hidalgo, Chiapas.

AGENT:  Ciudad Hidalgo, that—that is the city. Chiapas is the state. And Mexico is the country. So, if they ask you of what country you are a citizen, well, you're from Mexico.

MUNOZ: Mm-hmm.

*Id.* at 217-18.  While this demonstrates some confusion and unfamiliarity with the term "citizenship," Munoz-Perez clearly knows where he was born; he knows his city and state and understands that they are in Mexico.  And although the transcript also reflects

16

confusion in the final portion of the interview, regarding whether Munoz-Perez had previously been arrested or improperly entered the United States, *see id.* at 226-39, it appears this confusion resulted from inartful questioning or Munoz-Perez's intention to be deceptive in answering the questions rather than from any intellectual deficiencies.

Thus, considering the totality of the circumstances, *see Price*, 980 F.3d at 1226, the Court holds that the magistrate judge did not clearly err in finding that the Government had overcome the presumption against waiver.  In arriving at this conclusion, the Court compares this case with the rare cases in which the Ninth Circuit found a defendant had not knowingly and intelligently waived his *Miranda* rights.  In *United States v. Garibay*, the Ninth Circuit held that a defendant with a "low verbal IQ" who was interviewed in English, which he did not speak well, did not knowingly and intelligently waive his *Miranda* rights.  143 F.3d 534, 537 (9th Cir. 1998); *see also Cooper v. Griffin*, 455 F.2d 1142, 1144-46 (5th Cir. 1972) (holding that intellectually disabled teenagers did not knowingly and voluntarily waive their *Miranda* rights).  Here, Munoz-Perez was interviewed in Spanish, his native tongue, and there is no evidence that he suffered a mental impairment.  Moreover, initially expressing confusion about the *Miranda* rights is not enough to show an invalid waiver where the defendant later unequivocally states that they understood the rights.  *See, e.g.*, *United States v. Castro-Montijo*, 34 F. Supp. 3d 1134, 1136-37, 1139-40 (S.D. Cal. 2014); *United States v. Garcia-Pascual*, No. CR-14-01633-001, 2015 WL 935326, at *9, *11, *14 (D. Ariz. Mar. 4, 2015).  *But see United States v. Haak*, No. 13-CR-3395, 2013 WL 6263190, at *2-4 (S.D. Cal. Dec. 4, 2013).

In this case, although Munoz-Perez was young and without a criminal history and the transcript manifests that he was sometimes confused by Agent Tobar's questioning, these factors do not overcome the fact that he was interviewed in his native language, was read the *Miranda* rights twice, agreed that he understood his rights, and signed a *Miranda* waiver.  The magistrate judge therefore did not clearly err in admitting the station interrogation.

**III.   The translated transcript was not inadmissible hearsay and its admission did not violate the Confrontation Clause.**

Munoz-Perez challenges the admission of the translated transcript of his station interrogation as hearsay and a violation of his Confrontation Clause rights under the Sixth Amendment.  ECF No. 67 at 22-25.

At trial, the Government proffered evidence of a video recording of the station interrogation and a transcript of the interrogation, with the original Spanish and translated English side-by-side.  ECF No. 67-1 at 113-14.  The transcription and translation was produced by an interpreter from the U.S. Attorney's Office who had been certified by the AO.  *Id.* at 206-07.  Agent Tobar, the native Spanish speaker who conducted the station interrogation, authenticated the video and testified that he had watched the video and compared it to the transcript and that the translation was accurate.  *Id.* at 113-14.  The Government initially attempted to play the video, but the quality of the audio through the courtroom speakers was so low that it was largely incomprehensible.  ECF No. 67-1 at 113-38.  After a break due to the technical difficulties, the magistrate judge suggested reading the transcript in court.  *Id.* at 125.  Counsel for Munoz-Perez objected that reading the transcript without the audio was hearsay and violated Munoz-Perez's Sixth Amendment rights because the transcriber and translator was not available to testify.  *Id.* at 126.  The magistrate judge overruled the objections, explaining that "Agent Tobar did authenticate the accuracy of the video as well as the transcript.  It is not necessary, unless you can cite me some authority that says that it is necessary to have the person who actually did the translation be the only person who can authenticate the transcript or the translation."  *Id.* at 129.

In *United States v. Nazemian*, 948 F.2d 522, 527 (9th Cir. 1991), the Ninth Circuit first articulated a test to determine if the statements of an interpreter can be attributed to a defendant because the interpreter was a "mere language conduit."  Applying the "mere language conduit" test, Munoz-Perez asserts that "[b]ecause the transcript was created by an interpreter, who was acting as more than a mere language conduit, the transcript itself

was inadmissible hearsay, that did not fall within an exception.  Further, the interpreter-declarant was not made available for cross-examination, making the . . . introduction of the translation a clear violation of Mr. Munoz-Perez's Confrontation Clause rights[.]" ECF No. 67 at 22-23.  The Government contends that the *Nazemian* test is inapplicable because there was no interpreter during the interrogation; Agent Tobar and Munoz-Perez spoke to each other directly in Spanish.  ECF No. 68 at 14.  It argues that Munoz-Perez's challenges fail because Agent Tobar authenticated and adopted the transcript and translation.  *Id.* at 15.

The Government is correct that *Nazemian* and the line of cases that follow it are distinct from the facts here.  *Nazemian* addresses "the issue of how to treat extrajudicial statements made through an interpreter when the testifying witness was unable to understand the original language of the declarant and can testify only to the words of the interpreter."  948 F.2d at 526.  The *Nazemian* cases all involve testimony about an out-of-court exchange in which the witness spoke to the defendant through an interpreter.  *See, e.g.*, *United States v. Aifang Ye*, 808 F.3d 395, 401 (9th Cir. 2015); *United States v. Romo-Chavez*, 681 F.3d 955, 958-59 (9th Cir. 2012).  And as the Government points out, there was no interpreter during the station interrogation; rather, there was an out-of-court translation of the interrogation and the translator was not present to testify.  However, *Nazemian* offers a method of determining whether translated statements are hearsay and implicate the Confrontation Clause and is therefore useful in considering Munoz-Perez's challenge.

Although not raised by the parties, there is also a line of Ninth Circuit cases dealing with the admission of translated transcripts of non-English recordings, which the magistrate judge referenced in ruling that the transcript could be read in court.  ECF No. 67-1 at 124.  The doctrine described in these cases, culminating in *United States v. Abonce-Barrera*, 257 F.3d 959, 963 (9th Cir. 2001), focuses almost exclusively on the steps the trial court took to ensure the accuracy of the transcripts.  *Abonce-Barrera* and the cases from which it draws did not respond to a hearsay or Confrontation Clause

challenge. *See id.* at 962-64.  In fact, in these cases, either the parties stipulated to the transcript or the translator testified.  *See United States v. Fuentes-Montijo*, 68 F.3d 352, 353 (9th Cir. 1995) (stipulated); *United States v. Taghipour*, 964 F.2d 908, 910 (9th Cir. 1992) (stipulated); *United States v. Franco*, 136 F.3d 622, 629-30 (9th Cir. 1998) (testified); *United States v. Armijo*, 5 F.3d 1229, 1234 (9th Cir. 1993) (testified); *see also Abonce-Barrera*, 257 F.3d at 963 (the government provided defendant with drafts of the translation in advance and incorporated some, but not all, of defendant's edits to the transcript).  Thus, there does not appear to be binding authority addressing how to examine a hearsay or Confrontation Clause challenge to a translated transcript of a foreign language recording.  *See* Liesa L. Richter, *Lost in Translation: The Best Evidence Rule and Foreign-Language Recordings in Federal Court*, 108 Iowa L. Rev. 1839, 1850 (2023).[5]

The Court will primarily use the *Nazemian* test because, though factually distinct, it provides a framework for addressing hearsay and Confrontation Clause challenges to translated statements.  It will also conduct the *Abonce-Barrera* test as a backstop, to determine whether the magistrate judge abused his discretion by admitting the translated transcript.

By asking if the interpreter (or here, translator) is a mere language conduit, *Nazemian* assesses whether the statements of the translator can be attributed to the original speaker.  *See Nazemian*, 948 F.2d at 528.  If the translator is a mere language conduit under *Nazemian*, then the statements of the translator are attributable to the original speakers and do not violate the Confrontation Clause rights recognized by the

---

[5] "Although federal courts almost uniformly allow the substantive admission of English transcripts in the context of foreign-language recordings, most federal opinions addressing the admissibility of such transcripts gloss over a number of evidentiary hurdles to their admission. . . .  [T]here is scant treatment of the hearsay and confrontation issues involved in admitting an English-language transcript prepared by an expert translator outside of court." *Id.*

Supreme Court in *Crawford v. Washington*, 541 U.S. 36 (2004).  The Ninth Circuit explained:

> If a court were to hold that the statement must be attributed to the interpreter, it would, under *Crawford*, ask whether the statement, as applied to the interpreter, was testimonial.  If so, the statement could not be admitted without opportunity for confrontation of the interpreter.  But if the court determines that a statement may be fairly attributed directly to the original speaker, then the court would engage in the *Crawford* analysis only with respect to that original speaker.  Where, as here, that speaker is the defendant, the Sixth Amendment simply has no application because a defendant cannot complain that he was denied the opportunity to confront himself.

*United States v. Orm Hieng*, 679 F.3d 1131, 1140 (9th Cir. 2012); *see also Romo-Chavez*, 681 F.3d at 961 ("The Sixth Amendment guarantees a criminal defendant the right 'to be confronted with the witnesses against him.'  However, this right is not implicated here because [the interpreter's] translations are properly construed as [the defendant's] own statements.").

The Ninth Circuit considers on a case-by-case basis whether the translated statements fairly should be considered the statements of the original speaker under *Nazemian*.  948 F.2d at 527.  The Court reviews the question de novo.  *Aifang Ye*, 808 F.3d at 401.  To assess whether the translator was a mere language conduit under *Nazemian*, the Court considers the following factors: "(1) which party supplied the interpreter, (2) whether the interpreter had any motive to mislead or distort, [and] (3) the interpreter's qualifications and language skill[.]"[6]  *Romo-Chavez*, 681 F.3d at 959 (cleaned up).  Here, the Court finds that the transcriber and translator was a mere language conduit for Munoz-Perez.

---

[6] The Court does not consider the final *Nazemian* factor—whether actions taken subsequent to the conversation were consistent with the translated statements—because in the context of a transcript prepared for trial, no actions were taken subsequent to the translation.

First, although the Government provided the translator, "the fact that [the interpreter] is a government employee does not, by itself, necessarily prevent his translations from being admissible." *Id.* at 959 (internal quotation marks and citation omitted).  "This factor would have more weight if the translators were active in directing the interview, but they were not." *Aifang Ye*, 808 F.3d at 401.  The factor is particularly weak where the defense had an opportunity to provide their own translator but chose not to.  *Cf. Armijo*, 5 F.3d at 1234 ("[The defendant] had access to the tape before trial, but he chose not to submit his own translation or present an expert witness to contest the transcript's accuracy.").  Second, there is nothing in the record to suggest that the interpreter had a motive to mislead or distort the words of the original speakers, other than the already discussed fact that the translator appears to have been employed by the U.S. Attorney's Office, ECF No. 67-1 at 206-07.  The Court does not agree that "because [the translator was] provided by the prosecutor, . . . they had a natural and clear motive to mislead or distort."  ECF No. 67 at 23 (Opening Brief); *Romo-Chavez*, 681 F.3d at 960 ("We do not presume . . . that a public servant is inherently biased.").  And despite having the recording and transcript in advance, the defense has not indicated any distortions in the translation or disputed the accuracy of the transcript in any way.  Third, the translator was certified as an interpreter by the AO, *id.*, which strongly weighs in favor of her being a mere language conduit.  Taking these factors together, the Court finds that the translator was merely a language conduit and that the statements of the translator are attributable to the original speakers, Agent Tobar and Munoz-Perez.  Thus, there is no Confrontation Clause problem because Agent Tobar testified and Munoz-Perez has no need to confront himself.  And there is no hearsay problem because Munoz-Perez's statements were non-hearsay statements of a party-opponent.[7]  Fed. Evid. R. 801(d)(2)(A).

---

[7] Even if Munoz-Perez challenged Agent Tobar's statements in the transcript as inadmissible hearsay, the Court finds that his statements and questions were not offered

The Court next assesses whether the magistrate judge took sufficient steps to safeguard the accuracy of the transcript under *Abonce-Barrera*. The Court reviews for an abuse of discretion. *Abonce-Barrera*, 257 F.3d at 963. The *Abonce-Barrera* test is as follows:

> In the case of foreign language tapes, we review whether the following steps were taken to ensure the accuracy of the transcriptions and their translation: (1) whether the district court reviewed the transcriptions and translations for accuracy, (2) whether the defense counsel had the opportunity to highlight alleged inaccuracies and to introduce alternative versions, and (3) whether the jury was allowed to compare the transcript to the tape and hear counsel's arguments as to the meaning of the conversations.

257 F.3d at 963 (internal quotation marks and citation omitted).

The magistrate judge here did not abuse his discretion in admitting the transcript. First, although the magistrate judge did not review the translation for accuracy, he received testimony from Agent Tobar, a native Spanish speaker, who confirmed that he had reviewed the transcript and that it accurately reflected the interrogation, ECF No. 67-1 at 114. *See Armijo*, 5 F.3d at 1234 (holding the transcript was admissible even though "the trial judge did not review the tape for accuracy because he was not fluent in Spanish and there was no agent involved in the conversation who could testify to its accuracy"); *United States v. Moyhernandez*, 17 F. App'x 62, 70 (2d Cir. 2001) ("The District Court did not exceed its allowable discretion in admitting the transcripts or the voice attributions because both the case agent, who had spoken repeatedly with the defendant, and a police officer who interviewed the defendant in Spanish recognized his voice and agreed that the attributions were accurate."). Second, defense counsel had an opportunity to voir dire Agent Tobar about the transcript and did so. ECF No. 67-1 at 134-36. The Court also "find[s] it significant that the defense made no meaningful attempt to check

_____

for the truth of the matter asserted and served only to provide context for Munoz-Perez's statements.

21-mj-03297-WVG-GPC-1

the transcripts for accuracy or at least to obtain a continuance to examine such crucial evidence." *Pena-Espinoza*, 47 F.3d at 359.  Third, the magistrate judge—the trier of fact in the bench trial—heard counsel's arguments about the meaning of the statements made during the interrogation.[8]  ECF No. 67-1 at 143-62.  The Court cannot say that the magistrate judge abused his discretion when a native speaker testified that he had reviewed and verified the transcript, and defense counsel had access to the recording and transcript in advance, cross-examined the witness who authenticated it, and did not highlight any specific inaccuracies.

Having determined that there were sufficient safeguards to ensure the accuracy of the transcript, the Court finds that the magistrate judge did not abuse his discretion by admitting the translated transcripts.

## IV.   The Government sufficiently corroborated Munoz-Perez's admissions regarding improper mode of entry and alienage.

To convict for improper entry, the Government must prove that Munoz-Perez entered the U.S "at any time or place other than as designated by immigration officers," i.e. not through a Port of Entry, and that he was not a citizen of the U.S., i.e. alienage. 8 U.S.C. § 1325.  In the field interview, Munoz-Perez admitted directly to alienage, that he was a citizen of Mexico, and indirectly to improper entry, that he was present in the country without permission.  ECF No. 67-1 at 83.  In the station interrogation, he directly admitted to improper entry and indirectly admitted that he was a citizen of Mexico.  *Id.* at 216-18, 222.  Munoz-Perez challenges that the Government did not sufficiently

---

[8] It does not make sense in the context of a bench trial to ask whether the trier of fact had an opportunity to compare the tape and the transcript, because assuming both were admitted into evidence, the answer will always be yes.  *See Abonce-Barrera*, 257 F.3d at 963 (stating that the final factor is "whether the jury was allowed to compare the transcript to the tape and hear counsel's arguments as to the meaning of the conversations.").

corroborate his admissions in order for them to support his conviction under the doctrine of corpus delicti.  ECF No. 67 at 25.

Under the corpus delicti doctrine, a defendant's admissions require corroborating evidence to support a conviction.  *United States v. Lopez-Alvarez*, 970 F.2d 583, 589 (9th Cir. 1992).  "To satisfy the corroboration requirement, the Government must introduce independent evidence tending to establish the trustworthiness of the admissions, unless the confession is, by virtue of a special circumstances, inherently reliable."  *United States v. Hernandez*, 105 F.3d 1330, 1332 (9th Cir. 1997) (citation and internal quotation marks omitted).  The doctrine "does not require the government to introduce evidence that would be independently sufficient to convict the defendant in the absence of the confession.  Rather, it requires evidence sufficient to corroborate the defendant's confession."  *United States v. Valdez-Novoa*, 780 F.3d 906, 923 (9th Cir. 2015).  "[C]orpus delicti does not impose a high bar for the government to clear."  *United States v. Gonzalez-Godinez*, --- F.4th ---, 2024 WL 26675, at *4 (9th Cir. Jan. 3, 2024).  The Court reviews corroboration for clear error.  *Id.* at *2.

Munoz-Perez argues that the Government "relied almost exclusively on Mr. Munoz-Perez's purported confession to satisfy the illegal entry offense's mode-of-entry and alienage elements," and beyond Mr. Munoz-Perez's statements, "presented only limited circumstantial evidence about the area and circumstances in which he was arrested."  ECF No. 67 at 27.  But the circumstantial evidence here is "independent evidence tending to establish the trustworthiness of the admissions."  *Hernandez*, 105 F.3d at 1332.

Agent Alston, an independent source, testified that he found Munoz-Perez hiding "real deep in some brush," wearing no shoes and a set of handcuffs, with one cuff around his wrist and the other hanging.  ECF No. 67-1 at 81, 83, 85.  He had nothing else with him.  It was dark and the area was about six to seven miles from the border, mountainous, and with nothing nearby except a campground about a mile away.  *Id.* at 80.  Agent Alston had previously arrested individuals in the area for improperly crossing the border

into the U.S. *Id.* at 81. Testimony from Agent Alston and other Border Patrol agents suggests that Munoz-Perez had been arrested and handcuffed the night before closer to the U.S.-Mexico border, escaped, and then continued to make his way north. *Id.* at 32-35, 39, 57-58, 63-64, 82. The Government also presented evidence that there is no record that Munoz-Perez was granted permission to enter the U.S. *Id.* at 165-67. This all suggests that he entered improperly, not through a Port of Entry, and that he was not a U.S. citizen. As the Ninth Circuit explained, an individual's unauthorized presence in the United States "is circumstantial proof that is convincing unless explained away[.]" *Cf. United States v. Quintana-Torres*, 235 F.3d 1197, 1200 (9th Cir. 2000) (discussing the requirement that illegal re-entry under 8 U.S.C. § 1326 be voluntary).

Munoz-Perez contends that mode of entry evidence cannot alone be sufficient corroboration of alienage. ECF No. 67 at 29. However, the Ninth Circuit has held otherwise:

> [W]e explicitly declined [in a previous case] to hold that any individual piece of evidence presented by the government, including the mode of entry evidence, was by itself sufficient to corroborate the defendant's admissions. That was not the case before us then. It is the case before us now. Here, the mode of entry evidence comes not only from the defendant but also from two independent sources. That is sufficient to provide the corroboration.

*United States v. Garcia-Villegas*, 575 F.3d 949, 951 (9th Cir. 2009). All that is required is simply "independent evidence tending to establish the trustworthiness of the admissions[.]" *Hernandez*, 105 F.3d at 1332.

The location in which Munoz-Perez was discovered, that he was hiding, and that he did not have authorization to be in the U.S. sufficiently corroborate his admission of improper entry and of alienage—they establish the trustworthiness of his admission. *See Gonzalez-Godinez*, --- F.4th ---, 2024 WL 26675, at *4 (holding that defendant's two confessions of alienage were corroborated by evidence (1) that he was sliding away from the border fence or hiding in a "remote, easy-to-cross area" and (2) that the conditions under which he was discovered matched the details of his confession); *United States v.*

21-mj-03297-WVG-GPC-1

*Navarro-Zuniga*, No. 19-MJ-23353, 2023 WL 4491737, at *5 (S.D. Cal. July 12, 2023) (holding that evidence that the "defendant was found hiding by a bush about a mile from the U.S.-Mexico border in a remote area (1) closed to the public and (2) known as a common point for illegal entry" was sufficient corroboration); *United States v. Vera-Rivas*, No. 19-CR-3622, 2023 WL 2390533, at *3 (S.D. Cal. Mar. 7, 2023) (holding that defendant's admissions of alienage "were corroborated by the fact that he was encountered over 8 miles from the nearest Port of Entry in an area known to be utilized by illegal entrants," was initially hiding in the brush, and had no documents authorizing him to be in the U.S.).

As such, the magistrate judge did not clearly err in finding that Munoz-Perez's admissions regarding his mode of entry and alienage were corroborated.

## V.     8 U.S.C. § 1325 does not violate the Fifth Amendment's equal protection clause.

Munoz-Perez finally argues that 8 U.S.C. § 1325 violates the Fifth Amendment's equal protection guarantee.  ECF No. 67 at 31.  He acknowledges that the Ninth Circuit rejected this argument in *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1138 (9th Cir. 2023), but "maintains that [*Carrillo-Lopez*] was wrongly decided and preserves the relevant arguments in the event that *Carrillo-Lopez* is overturned by a higher court." ECF No. 67 at 31.  As this Court is bound by the Ninth Circuit's decision, it must reject this argument.

## CONCLUSION

For the reasons described above, the Court AFFIRMS the magistrate judge's conviction.

**IT IS SO ORDERED.**

Dated:  January 25, 2024

Hon. Gonzalo P. Curiel
United States District Judge

21-mj-03297-WVG-GPC-1